IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 10-cv-01935-PAB-MEH

SCOTT NAGLE,

     Plaintiff,

v.

SHERIFF TED MINK, in his official and individual capacities,
UNDERSHERIFF RAY FLEER, in his individual capacity,
CHIEF JEFFREY SHRADER, in his individual capacity, and
CAPTAIN PATRICIA WOODIN, in her individual capacity,

     Defendants.

_____

## ORDER
_____

This matter is before the Court the Motion for Summary Judgment [Docket No. 57] filed by defendants Sheriff Ted Mink, Undersheriff Ray Fleer, Division Chief Jeffrey Shrader, and Captain Patricia Woodin.[1]  The motion is fully briefed and ripe for disposition.

## I.  BACKGROUND [2]

This case arises out of plaintiff Scott Nagle's termination from the Jefferson County Sheriff's Office ("JCSO").  Mr. Nagle worked for the JCSO from April 1998 until October 31, 2008.  He began his employment as a Deputy Sheriff at the Jefferson County Detention facility.  In June 2000, he became a full-time Deputy Sheriff in the

_____

[1]In the Final Pretrial Order, plaintiff stipulated to the dismissal of defendants Undersheriff Ray Fleer, Division Chief Jeffrey Shrader, and Captain Patricia Woodin. Docket No. 92 at 3, ¶ 1.

[2]The following facts, unless otherwise indicated, are not in dispute.

patrol division.[3]   As a member of the patrol division, Deputy Nagle's regular duties included submitting Daily Field Activity Reports ("DFARs"), completing timely arrest reports, and closing open investigations.

Between 1998 and 2008, the Internal Affairs Unit ("IA")[4] investigated Deputy Nagle on twelve different occasions.  *See* Docket No. 57-2 at 1-2, ¶ 3.  As a result of these investigations, Deputy Nagle was temporarily suspended and received written reprimands, although some of the complaints were deemed unsubstantiated.  *See, e.g.,* Docket No. 57-3 (on June 22, 2004, was suspended for 20 hours without pay and placed on probation for a year for providing a false answer for taking sick leave); Docket No. 57-4 (on August 16, 2004, a written reprimand for failing to report an off-duty traffic altercation); Docket No. 57-6 (on September 11, 2007, written reprimand for several instances of erratic driving); Docket No. 57-21 (on April 13, 2008, citizen complaint found to be unsubstantiated).  During the course of these investigations, Deputy Nagle's work performance problems persisted.

On October 21, 2007, Deputy Nagle received a formal written reprimand from his supervisor, Sergeant Dennis Gerlach.[5]  *See* Docket No. 57-7.  On February 15, 2008,

---

[3] Employees of the JCSO work in four different divisions: support services, investigations, patrol, and detentions.  In the patrol division, the chain of command is as follows from lowest to highest ranking officer: Deputy Sheriff, Sergeant, Lieutenant, Captain, Division Chief, Undersheriff, and Sheriff.

[4] At the JCSO, the Internal Affairs Unit investigates complaints filed against officers.  Once IA completes an investigation, a report of the findings is provided to the supervising lieutenant who recommends an appropriate disposition.  Lieutenant recommendations range from finding that a complaint is unsubstantiated to finding that an officer's conduct warrants a temporary suspension.

[5] In the written reprimand, Sergeant Gerlach describes Deputy Nagle's failure to submit timely DFARs and promptly close open investigations.  *See* Docket No. 57-10.

2

Deputy Nagle was placed on an employee performance plan.  Docket No. 57-10.

According to the performance plan, the JCSO performed quarterly reviews to track

Deputy Nagle's work performance.  *Id*.  Sergeant Michael Walline conducted Deputy

Nagle's quarterly reviews and his reports show that, although Deputy Nagle could

adequately perform the duties of a Deputy Sheriff, his performance was generally

inconsistent.  *See* Docket Nos. 57-11, 57-12.

On April 13, 2008, Lieutenant Michael Prange initiated a Personal Early Warning

System ("PEWS")[6] for Deputy Nagle as a result of an IA investigation into one of Deputy

Nagle's arrests.  Docket No. 57-21 at 2.  Although Lieutenant Prange found that the

complaint leading to the IA investigation was unsubstantiated, he recommended the

PEWS because of the rising number of investigations into Deputy Nagle's on-duty

conduct since June 2000.  *Id*.  On April 30, 2008, IA initiated another investigation into

Deputy Nagle's conduct with regard to three incidents: (1) performing police maneuvers

on his son, (2) discrepancies between locations listed in his DFARs and the locations

registered by the JCSO's Automatic Vehicle Locator, and (3) failure to promptly

investigate an unlawful sexual contact complaint.  *See* Docket No. 57-23.

On May 9, 2008, Deputy Nagle contacted his treating physician, Dr. Jonathan

Albert, because he experienced symptoms of what he believed could be diabetes.[7]

---

Additionally, Sergeant Gerlach recommends that Captain Rob Baker suspend Deputy
Nagle for two days.  *Id.*

[6]The PEWS is a program designed to help JCSO employees identify issues
adversely impacting their work performance.  Docket No. 57-22 at 2, ¶ 4.

[7]Deputy Nagle did not inform Dr. Albert that his symptoms affected his ability to
perform his duties as a Deputy Sheriff.  Docket No. 57-30 at 7 (Albert Dep. 33:5-18).
He also had not previously informed Dr. Albert that he had problems associated with

Docket No. 57-31 at 1.  Deputy Nagle had a family history of diabetes and, because of his symptoms, sought to test his blood sugar levels.[8]  *Id.*  On May 11, 2008, Dr. Albert diagnosed Deputy Nagle with Type II diabetes and prescribed metformin to treat plaintiff's symptoms.  Docket No. 71-9.[9]  Unlike Type I diabetes, Type II diabetes does not usually impede an individual's ability to produce insulin.  Docket No. 57-30 at 3 (Albert Dep. 19:1-3).  Instead, Type II diabetes interferes with a person's ability to utilize the insulin he or she produces.  *Id.* (Albert Dep. 19:8-12).  In that regard, metformin is a drug that increases the ability for cells in the liver and muscles to utilize naturally produced insulin.  Docket No. 71-6 at 1-2 (Albert Dep. 23:23-24:1).

After two weeks on metformin, Deputy Nagle told Dr. Albert that he had an increase in energy and no side effects from the medication.  *See* Docket Nos. 57-34, 57-35.  Additionally, between May 2008 and July 2008, Deputy Nagle was able to work full-time without restrictions.  Docket No. 57-25 at 12-13 (Nagle Dep. 60:24-61:2).  Moreover, Deputy Nagle states in his deposition that he was able to perform all of his duties as a Deputy Sheriff when his diabetes was under control, which he accomplished

---

memory loss or fatigue.  *Id.* at 14 (Albert Dep. 52:3-12).

[8]Before Deputy Nagle's visit, Dr. Albert reviewed one of Deputy Nagle's blood tests from November 2007, which did not indicate any signs of diabetes.  Docket No. 57-30 at 12 (Albert Dep. 49:2-6).  Although Dr. Albert testified that one blood sample is insufficient to show that an individual has diabetes, Docket No. 71-6 at 3 (Albert Dep. 41:21-25), the test from November 29, 2007 measures blood glucose levels as well as several other indicators.  Docket No. 57-31 at 2.

[9]Generally, individuals with Type II diabetes are asymptomatic and the diabetes does not affect their daily activities or their ability to work.  Docket No. 57-30 at 6 (Albert Dep. 31:7-23).

through medication, diet, and exercise.  Docket No. 57-25 at 6 (Nagle Dep. 40:17-19);
*see id*. at 9 (Nagle Dep. 57:21-23).

On May 19, 2008, Lieutenant Prange held a meeting with Deputy Nagle to
discuss the PEWS.  Docket No. 57-22 at 2.  Deputy Nagle reviewed the preliminary
conclusions in the PEWS and had an opportunity to discuss other personal issues
affecting his work performance.  Docket No. 57-24.  Deputy Nagle reported that the
main stressors in his life during that time period were his son and ex-wife.  *Id*.  Deputy
Nagle, however, did not inform Lieutenant Prange about his recent diagnosis of
diabetes.  Docket No. 57-22 at 2, ¶ 5.  Deputy Nagle states in his deposition that he did
not inform Lieutenant Prange about the diabetes because he wanted to follow the chain
of command and first advise the supervising sergeant.[10]  Docket No. 57-25 at 15 (Nagle
Dep. 106:11-13).

Deputy Nagle told his supervisor, Sergeant Walline, about his diabetes on July 6,
2008.[11]  Docket No. 71-14; *see also* Docket No. 57-25 at 19 (Nagle Dep. 119:17-21).
He alleges he told Sergeant Walline that the diabetes affected his work performance
and that Sergeant Walline did not relay this information up the chain of command.  *Id*. at
20 (Nagle Dep. 120:2-6).  Sergeant Walline testified in his deposition that he did not
relay the information because Deputy Nagle did not give him the impression that the

---

[10]Between May 2008 and July 2008, Deputy Nagle did not inform Captain
Woodin or Lieutenant Prange about his diabetes.  Docket No. 57-25 at 13 (Nagle Dep.
61:11-16).

[11]Deputy Nagle also told Deputy Jerry Warren about his diabetes diagnosis.
Docket No. 57-25 at 15 (Nagle Dep. 106:18-21).  However, Deputy Nagle did not think
that Deputy Warren had the authority to accommodate his condition.  *Id*. at 19 (Nagle
Dep. 119:8-9).

diabetes had more than a minimal impact on his life.  Docket No. 83-3 at 6-7 (Walline

Dep 17:22-18:4); *see also* Docket No. 71-14.

On June 25, 2008, Lieutenant Prange recommended that the JCSO terminate

Deputy Nagle's employment "[d]ue to Deputy Nagle's continued failures to perform and

his inability to accept responsibility for his actions."  Docket No. 57-27 at 2.  On July 2,

2008, Lieutenant Prange sent a memo to Captain Woodin detailing the history of Deputy

Nagle's work performance and disciplinary history, which advised that the JCSO should

terminate Deputy Nagle's employment.  *See* Docket No. 57-28 at 6.  At the time of the

recommendation, Lieutenant Prange was not aware that Deputy Nagle was diagnosed

with diabetes.  Docket No. 57-22 at 3, ¶ 10.

On September 2, 2008, Captain Woodin also recommended that the JCSO

terminate Deputy Nagle's employment.  Docket No. 57-2 at 4, ¶ 13.  Captain Woodin

based her recommendation on the IA reports, Deputy Nagle's work history, and his

inability to improve despite the performance plan.  Docket No. 57-37.[12]  Deputy Nagle

appealed Captain Woodin's recommendation to Division Chief Shrader.

Between September and October 2008, Division Chief Shrader met with Deputy

Nagle on three separate occasions.[13]  Docket No. 57-38 at 2, ¶ 4.  On October 6, 2008,

---

[12]Sometime in September, Captain Woodin asked Sergeant Walline to write a
memo about his discussion with Deputy Nagle in July 2008.  Docket No. 71-5 at 8-9
(Walline Dep. 32:4-33:6).  Captain Woodin also requested that Sergeant Walline write a
memo about a citizen complaint lodged against Deputy Nagle.  *Id*. at 17 (Walline Dep.
54:18-20).  Sergeant Walline said that writing a report about a citizen complaint was
unusual and is not a request ordinarily made when citizen complaints are filed.  *Id*. at 19
(Walline Dep. 56:3-10).

[13]During the meeting with Division Chief Shrader on September 2, 2008, Deputy
Nagle requested a transfer to the detention facility.  Docket No. 71-1 at 1, ¶ 4.  On
September 9, 2008, Deputy Nagle notified Division Chief Shrader of his diabetes for the

Division Chief Shrader issued a memo recommending that the JCSO terminate Deputy

Nagle's employment.  Docket No. 57-40.  In the memo, Division Chief Shrader noted

that "[i]n spite of challenges from a variety of supervisors . . . Deputy Nagle has

performed below standards" and that anything other than termination "is not likely to

correct these long-standing concerns."  *Id*. at 2.  As a result, plaintiff appealed Division

Chief Shrader's decision to Undersheriff Fleer.

Deputy Nagle then had two meetings with Undersheriff Fleer, which he recorded

without Undersheriff Fleer's consent.  Docket No. 57-41 at 1-2, ¶ 3.  In the October 24,

2008 meeting, plaintiff told Undersheriff Fleer that his diabetes affected his work

performance.  Docket No. 71-10 at 1, ll. 18-20.  Deputy Nagle, however, maintained that

he could perform the duties of a Deputy Sheriff and would change his manner of

performing his work.  Docket No. 57-41 at 8, ll. 18-20.  Deputy Nagle also claims to

have given Undersheriff Fleer a signed letter dated September 11, 2008 from Dr. Albert

as proof of the diabetes diagnosis.  *See* Docket No. 71-9.  Undersheriff Fleer does not

remember receiving plaintiff's letter.[14]  On October 20, 2008, Undersheriff Fleer denied

plaintiff's appeal and recommended termination, Docket No. 57-42, which plaintiff

appealed to Sheriff Mink.

On October 29, 2008, Sheriff Mink held a meeting with Deputy Nagle wherein

plaintiff provided mitigating evidence.  Docket No. 57-1 at 2, ¶ 9.  Deputy Nagle told

first time.  Docket No. 57-38 at ¶ 5.

[14]In the transcript of the meeting, Undersheriff Fleer states "[i]t says here that you were diagnosed, and you're on medication."  Docket No. 71-10 at 5, ll.6-7.  Deputy Nagle claims that Undersheriff Fleer's statement refers to Dr. Albert's letter provided in Docket No. 71-9.

Sheriff Mink about his diabetes and how it affected his performance.  Docket No. 71-13 at 3 (Mink Dep. 54:9-13).  Sheriff Mink did not find it credible that the diabetes impacted Deputy Nagle's work performance and, because there were no medical records supporting this claim, denied Deputy Nagle's appeal and terminated his employment in a letter dated October 31, 2008.  Docket No. 57-44.[15]  In his deposition, Sheriff Mink states that he sought supporting information such as a doctor's report which showed how plaintiff's diabetes affected his work performance or a major life activity.  Docket No. 71-13 at 6 (Mink Dep. 72:5-11).  Sheriff Mink also testified that Undersheriff Fleer told him that there was no documentation of Deputy Nagle's claim that diabetes affected his performance.  *Id*. at 2 (Mink Dep. 39:3-6).

On February 9, 2009, plaintiff filed a charge of discrimination with the Colorado Civil Rights Division.  Docket No. 57-9.[16]  On August 13, 2010, Deputy Nagle filed this lawsuit.  Docket No. 1.  In the complaint, he asserts that he was subject to (1) discrimination because of a disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., and (2) retaliation for requesting accommodation for his disability.[17]

---

[15]In the termination letter, Sheriff Mink remarks that Deputy Nagle had a "consistent theme of poor work performance . . . specific to reports, report writing and timely submission of reports."  Docket No. 57-44.  It also states that Deputy Nagle repeatedly failed to achieve performance goals established by his supervisors.  *Id*.

[16] Neither side has provided the date of the right-to-sue letter and whether plaintiff filed this action within 90 days of its receipt.

[17]Plaintiff voluntarily dismissed a 42 U.S.C. § 1983 equal protection claim. Docket No. 71 at 29.

On October 3, 2011, defendants filed this motion for summary judgment.  In the motion, defendants argue that the Court should enter summary judgment in their favor because (1) Deputy Nagle is not disabled within the meaning of the ADA and (2) the Court lacks subject matter jurisdiction over his retaliation claim because Deputy Nagle failed to exhaust his administrative remedies.  *See* Docket No. 57.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986); *Concrete Works of Colo., Inc. v. City & Cnty. of Denver,* 36 F.3d 1513, 1517 (10th Cir. 1994); *see also Ross v. The Board of Regents of the Univ. of New Mexico*, 599 F.3d 1114, 1116 (10th Cir. 2010).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997).  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

## III.  ANALYSIS

### A.  Discrimination in Violation of the ADA

The ADA provides that "[n]o covered entity shall discriminate against a qualified

individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and

other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  In cases

such as this, where a plaintiff seeks to establish an ADA violation through circumstantial

evidence, the Court applies the burden-shifting framework outlined in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Johnson v. Weld Cnty., Colo.,* 594

F.3d 1202, 1217 (10th Cir. 2010); *MacKenzie v. City and Cnty. of Denver*, 414 F.3d

1266, 1274 (10th Cir. 2005).  Accordingly, Deputy Nagle must first establish a prima

facie case of discrimination, showing that a genuine issue of material fact exists on each

of three points: (1) he is a disabled person as defined by the ADA; (2) he is qualified,

with or without accommodation, to perform the essential functions of the job held or

desired; and (3) his employer discriminated against him because of his disability.  *See*

*Zwygart v. Bd. of Cnty. Comm'rs of Jefferson Cnty. Kan.*, 483 F.3d 1086, 1090 (10th

Cir. 2007).[18]  If Deputy Nagle can establish a prima facie case of discrimination, then

---

[18]The ADA was amended on September 25, 2008; however, the amendments became effective on January 1, 2009.  ADA Amendments Act of 2008 (ADAAA"), Pub. L. 110-325, 122 Stat. 3553 (2008).  The amendments do not apply retroactively.  *See Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1261 n.2 (10th Cir. 2009) (unnecessary to consider the effect of the ADA amendments because the challenged conduct took place prior to the amendments taking effect); *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1143 (10th Cir. 2011) (ADAAA does not operate retroactively); *LaBrue v. Gab Robins N. Am., Inc.*, 2009 WL 2355785, at *4 (D. Kan. July 29, 2009) (collecting cases).  In this case, the conduct at issue occurred before the effective date of the ADAAA.  Accordingly, the Court will not consider those amendments for the purposes of this motion.

defendants must offer non-discriminatory reasons for their employment decision.
*MacKenzie*, 414 F.3d at 1274.  Should defendants articulate a non-discriminatory
reason, Deputy Nagle would then bear the ultimate burden of showing that defendants'
reason is, in fact, a pretext designed to mask discrimination.  *Id*.

Under the ADA, an individual is considered "disabled" if he: (1) has a physical or
mental impairment that substantially limits one or more of his major life activities; (2) has
a record of such an impairment; or (3) is regarded by his employer as having such an
impairment.  42 U.S.C. § 12102(1); *see Lanman v. Johnson Cnty., Kansas*, 393 F.3d
1151, 1156 (10th Cir. 2004).  Deputy Nagle does not contend that he has a record of a
physical impairment that substantially limits one or more of his major life activities, nor
does he argue that defendants regarded him as having such an impairment.  *See*
Docket No. 71 at 13-15.  Accordingly, the Court's inquiry focuses on whether Deputy
Nagle is disabled within the meaning of the ADA.

To establish that he is disabled within the meaning of the ADA, Deputy Nagle
"must (1) have a recognized impairment, (2) identify one or more appropriate major life
activities, and (3) show the impairment substantially limits one or more of those
activities."  *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1216 (10th Cir. 2007).  Whether
a plaintiff has met the first two requirements are questions of law.  *Doebele v.
Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003).  But whether the
impairment substantially limits a major life activity is ordinarily a question of fact for the
jury.  *Id.*

### 1.   Physical Impairment

The ADA does not define physical or mental impairments.  However, a regulation

promulgated by the Equal Employment Opportunity Commission ("EEOC") in effect

when Deputy Nagle's employment was terminated defines impairments under the ADA

as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss

affecting one or more of the following body systems: neurological, musculoskeletal,

special sense organs, respiratory (including speech organs), cardiovascular,

reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine."  29

C.F.R. § 1630.2(h)(1) (2008) (amended 2011).  Deputy Nagle alleges that his Type II

diabetes, which is only controlled pursuant to medication, qualifies as a physical

impairment.  Docket No. 71 at 13-14.  Defendants do not contest that diabetes meets

the definition of impairment.  Docket No. 57 at 15.  For the purposes of the current

motion, the Court assumes that Deputy Nagle's Type II diabetes qualifies as a physical

impairment.[19]

### 2.   Major Life Activity

A "major life activity" is a basic activity that the average person in the general

population can perform with little or no difficulty.  *Mondaine v. Am. Drug Stores, Inc.*,

408 F. Supp. 2d 1169, 1199 (D. Kan. 2006).  Although the ADA uses broad language to

define major life activities, the Supreme Court has interpreted a major life activity

---

[19]As will be discussed in greater detail below, the Court notes that plaintiff's impairment is distinguishable from the plaintiff in *Carter v. Pathfinder Energy Servs.*, 662 F.3d 1134 (10th Cir. 2011).  In that case, the Tenth Circuit focused not only on the plaintiff's diabetes, but on the fact that the plaintiff had both diabetes and hepatitis C which "affected his digestive and circulatory systems during that period of time."  *Id.* at 1142.  Deputy Nagle has not shown that his diabetes affects him on a daily basis to the same degree described by the plaintiff in *Carter*.

"strictly," holding that the definition "refers to those activities that are of central importance to daily life." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553. Deputy Nagle must articulate with precision the impairment alleged and the major life activity affected by that impairment, and the Court is to analyze only those activities identified by plaintiff. *Poindexter v. Atchison, Topeka & Santa Fe Ry. Co.*, 168 F.3d 1228, 1231-32 (10th Cir. 1999).

In this case, Deputy Nagle contends that his Type II diabetes affects his major life activity of work. Docket No. 71 at 14. Although the Tenth Circuit has recognized work as a major life activity, it has cautioned that dependence on work as a major life activity should be used "only as a last resort." *Carter v. Pathfinder Energy Servs.*, 662 F.3d 1134, 1146 (10th Cir. 2011); *see Dillon v. Mountain Coal Co., LLC*, 569 F.3d 1215, 1219 (10th Cir. 2009) ("Proving that an employee is regarded as disabled in the major life activity of working takes plaintiff to the farthest reaches of the ADA."); *MacKenzie*, 414 F.3d at 1275-76 n. 14 (discussing whether work should be a major life activity under the ADA). Additionally, the Supreme Court has repeatedly questioned whether "working" qualifies as a major life activity. *See Toyota Motor Mfg.*, 534 U.S. at 200 ("Because of the conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much, and we need not resolve this difficult question today"); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492 (1999), *superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (identifying "some conceptual difficulty in defining major life activities to include work" but assuming without deciding that working is a major life activity). Thus, with

13

these caveats, the Court finds that Deputy Nagle has satisfied the second element by identifying work as his major life activity. *Dillon*, 569 F.3d at 1219.

### 3.   Substantial Limitation of Major Life Activity of Working

"When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' [means] . . . 'significantly restricted in the ability to perform either a class of jobs or a broad range of job in various classes as compared to the average person having comparable training, skills and abilities.'" *Sutton*, 527 U.S. at 491 (quoting 29 C.F.R. § 1630.2(j)(3)(i) (1998).[20]   The EEOC regulation states that "class of jobs" refers to "jobs utilizing similar training, knowledge, skills or abilities" within "the geographical area to which the [plaintiff] has reasonable access." 29 C.F.R. § 1630.2(j)(3)(ii)(A)-(B) (2008).   Thus, to be substantially limited in the major life activity of working, "one must be precluded from more than one type of job, a specialized job, or a particular job of choice . . . [s]imilarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs." *Sutton*, 527 U.S. at 492.

As the Tenth Circuit noted in *Carter*, the determination of whether an individual is disabled "depends on whether the limitations an individual with an impairment *actually* faces are in fact substantially limiting." *Id*. at 662 F.3d at 1144 (citation omitted) (emphasis in original).   Hence, the Court must not rely on "hypothetically controllable disabilities," and focus instead on the actual effects of the corrective measures on plaintiff's functioning capacities. *Id*. at 1144-45.

Given this framework, Deputy Nagle has not raised a genuine issue of material fact that he has an inability to perform a broad range of work.   First, he states in his

---

[20]29 C.F.R. § 1630.2(j)(3)(i) (2008) recites identical language.

deposition that he was able to perform all of the duties required of a Deputy Sheriff when his diabetes was under control through medication.  Docket No. 57-25 at 6-7 (Nagle Dep. 40:17-19, 41:7-8).  Second, Deputy Nagle testified that he can control his symptoms of fatigue and memory loss through a combination of diet, exercise, and medication.  *Id*. at 9 (Nagle Dep. 57:22-23).  Third, Deputy Nagle was able to work full-time without restrictions between May 2008 and July 2008.  Docket No. 57-25 at 12 (Nagle Dep. 60:24-61:2).  Fourth, Dr. Albert, Deputy Nagle's treating physician, testified that Deputy Nagle never complained of memory loss or an inability to perform his work duties during doctor visits.  Docket No. 57-30 at 14 (Albert Dep. 52:3-12).  Fifth, despite having knowledge of his diabetes in May 2008, Deputy Nagle did not assert a connection with his poor performance and his diabetes until July 6, 2008, four days after Lieutenant Prange recommended that the JCSO terminate his employment.  Consequently, the evidence in the record shows that Deputy Nagle was not substantially limited in his ability to perform his duties as a Deputy Sheriff when under a proper diet and medication.  *Carter*, 662 F.3d at 1144 (noting that district courts must determine whether corrective measures decrease the substantial limitations of an impairment); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 924 (7th Cir. 2001) (courts must "examine the plaintiff's condition as it exists after corrective or mitigating measures . . . are taken into account.").

To the extent plaintiff relies on *Carter*, the Court finds that case is distinguishable.  In *Carter*, the Tenth Circuit found that the plaintiff raised a triable issue as to whether "oral medication would have controlled his impairments."  662 F.3d at 1145.  Here, Deputy Nagle did not show that his diabetes affected his ability to work when it was

controlled by medication.  Although he mentioned in his deposition that the diabetes was sometimes not under control, he did not assert that this was a frequent occurrence or that it impeded his ability to perform the duties of a Deputy Sheriff.  On the contrary, the record shows that he was able to perform his duties as Deputy Sheriff without restrictions from May 2008, when he was first diagnosed, until July 2008 when he was suspended.  Moreover, although the Tenth Circuit discussed work as a major life activity in *Carter*, the Tenth Circuit expressly made "no determination as to whether a reasonable jury could find that [the plaintiff] was substantially limited in working."  *Id*. at 1146.  Thus, even viewing all the evidence in the record in a light most favorable to Deputy Nagle, the Court finds that he has not raised a genuine dispute of fact that his diabetes substantially limited his ability to perform his duties as a Deputy Sheriff.

Deputy Nagle also fails to provide evidence that he was substantially limited from performing "a class of jobs" that utilized similar training, knowledge, skills, or abilities as a Deputy Sheriff in his geographic area.  *Sutton*, 527 U.S. at 492 ("if a host of different types of jobs are available, one is not precluded from a broad range of jobs.").  He has introduced no evidence that he was substantially limited from performing available jobs which required skills similar to those of a Deputy Sheriff.  Consequently, the record in this case is not sufficient to allow a reasonable jury to determine that Deputy Nagle is substantially limited in his major life activity of working.  Deputy Nagle therefore fails to raise a genuine issue of fact as to whether he satisfies the ADA's definition of "disability" in 42 U.S.C. § 12102.  Accordingly, the Court concludes that defendants are entitled to summary judgment on Deputy Nagle's claim of discrimination in violation of the ADA because he fails to establish a prima facie case of discrimination.

16

**B.   Retaliation under the ADA**

Defendants argue that Deputy Nagle's failure to "check" the retaliation box on his charge of discrimination strips the Court of subject matter jurisdiction.  Docket No. 57 at 29.  Defendants also contend that nothing in the text of plaintiff's EEOC charge can reasonably constitute a claim of retaliation for engaging in protected activity.  *Id*.

An ADA plaintiff must exhaust his or her administrative remedies for each individual discriminatory or retaliatory act.  *MacKenzie*, 414 F.3d at 1274.  "In the Tenth Circuit, exhaustion of administrative remedies is a jurisdictional prerequisite to suit." *Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007) (citation omitted).  The Court is permitted to exercise jurisdiction over claims falling within "the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC."  *Id.* at 1186.  "[B]ecause failure to exhaust administrative remedies is a bar to subject matter jurisdiction, the burden is on the plaintiff as the party seeking federal jurisdiction to show, by competent evidence, that [he] did exhaust."  *McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1106 (10th Cir. 2002).

In determining whether a plaintiff has exhausted his or her administrative remedies, the Court must identify the scope of the allegations raised in the EEOC charge because a "plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC."  *MacKenzie*, 414 F.3d at 1274.  "However, complaints to the EEOC must be liberally construed in order to accomplish the purposes of the [ADA], since such complaints are written by laymen not versed either in the

17

technicalities of pleading or the jurisdictional requirements of the [ADA]." *Romero v. Union Pac. R.R.*, 615 F.2d 1303, 1311 (10th Cir. 1980).

Generally, a charge of discrimination form contains boxes for a charging party to check as the basis for his or her discrimination claim.[21]  By checking a box, a plaintiff can assert a claim for discrimination based on race, retaliation, color, age, sex, disability, religion, and national origin.  *See* Docket No. 57-9.  The failure to mark a particular box on a charge of discrimination creates a presumption that the charging party is not asserting claims represented by that box.  *Jones*, 502 F.3d at 1186.  The presumption may be rebutted, however, if the text of the charge clearly sets forth the basis of the claim.  *Id*.  In this case, it is undisputed that Deputy Nagle failed to mark the "retaliation" box in his charge of discrimination.  *See* Docket No. 57-9 at 1.  The relevant inquiry then is whether the EEOC could reasonably have investigated a retaliation claim based on the text contained in the form.  *MacKenzie*, 414 F.3d at 1274.

Deputy Nagle argues that the text of his charge of discrimination clearly raises a claim for retaliation.[22]  Docket No. 71 at 28.  In his response, he contends that "he

---

[21]A plaintiff can also describe the factual allegations of his or her charge in writing beneath the boxes.

[22]The relevant portion of Deputy Nagle's charge of discrimination states the following:

> On or about 10/31/08 I was terminated.  I appealed through the chain of command, explaining about my disability and asking for a reasonable accommodation, which was denied all the way up to the Sheriff of Jefferson County.  During the appeal process I have been denied to have an attorney represent me and I was denied a hearing.  The policies for the Jefferson County Sheriff's Office allow for a hearing to present witnesses and documentation to be considered in the appeal process.  Such a hearing was never provided for and I was denied the right to present witnesses and documentation on my behalf.

unequivocally explained about his diabetes and request for accommodation, which was denied . . . [and] that the employer (for whatever reason) also denied him to have an attorney represent him and denied a fair process which was mandated under Departmental policy." *Id.* (citation omitted).

Construed liberally, the Court finds that Deputy Nagle's charge of discrimination rebuts the presumption established by his failure to check the retaliation box. Deputy Nagle's charge could be read as alleging that defendants' refusal to provide him with an attorney during the appeal process was retaliation for his request for an accommodation. When read in this light, an investigation reasonably could have followed from plaintiff's charge as to whether defendants' failure to provide plaintiff with an attorney was retaliatory. *Jones*, 502 F.3d at 1185-87. As such, Deputy Nagle exhausted administrative remedies for his claim of retaliation.

Although Deputy Nagle's charge of discrimination asserts a lack of representation as the basis for his retaliation claim, his response now alleges that defendants retaliated against him when (1) Captain Woodin requested that Sergeant Walline write a memo regarding his July 6, 2008 discussion about diabetes with Deputy Nagle, (2) Captain Woodin asked Sergeant Walline to write a memo about a citizen complaint lodged against plaintiff, and (3) Undersheriff Fleer allegedly excluded Dr. Albert's September 11, 2008 letter from Deputy Nagle's file such that Sheriff Mink could not review the letter. Docket No. 71 at 29.

---

Docket No. 57-9 at 2

The ADA prohibits retaliation against any individual "because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203.  To establish a prima facie case of retaliation under the ADA, a plaintiff must demonstrate that: (1) he engaged in protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action.  *Hennagir v. Utah Dep't of Corrs.*, 587 F.3d 1255, 1265 (10th Cir. 2009).  In the absence of direct evidence of retaliation, an ADA retaliation claim is analyzed under the *McDonnell Douglas* burden-shifting framework.  *Id.*

In this case, the fact that plaintiff is not disabled under the ADA does not necessarily bar his retaliation claim.  The Tenth Circuit has held that, under the ADA, a plaintiff need not show that he suffers from an actual disability; instead, the plaintiff need only show that he had a reasonable good faith belief that the ADA had been violated.  *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001).  Here, Deputy Nagle attributed his work performance problems to fatigue and memory loss.  After May 11, 2008, plaintiff believed that his fatigue and memory loss were a direct result of his diabetes.  Given these facts, plaintiff established that he had a good faith belief that his diabetes was a physical impairment and that defendants violated the ADA by failing to accommodate him.

In addition, the Court finds that plaintiff has established the first two prongs of a prima facie case of retaliation.  First, Deputy Nagle's request for an accommodation

20

qualifies as protected activity.[23]  *Jones*, 502 F.3d at 1194 ("we have treated requests for reasonable accommodation as protected activity under the ADA.").  Second, Deputy Nagle's termination qualifies as an adverse employment action.  *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999) (noting that a termination is an adverse employment action).  Nevertheless, the Court finds that plaintiff has failed to establish a causal connection between his request for an accommodation and his termination.

Plaintiff's retaliation claim raises the issue of subordinate bias retaliation.  In *Equal Employment Opportunity Commission v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476 (2006), the Tenth Circuit first adopted the doctrine of subordinate bias.  In *BCI*, the Tenth Circuit held that a plaintiff can establish a claim of subordinate bias if he shows that the "biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action."  *Id*. at 487 (citing *Lust v. Sealy, Inc.*, 383 F.3d 580, 584 (7th Cir. 2004)).  The Tenth Circuit noted that a plaintiff must establish more than mere "influence" or "input" in the decisionmaking process.  *Id*.  Additionally, the Tenth Circuit stated that the causal link is defeated when the "employer has taken care not to rely exclusively on the say-so of the biased subordinate . . . [and] an employer can avoid liability by conducting an independent investigation of the allegations against an employee."  *Id*. at 488.

With respect to Captain Woodin's actions, plaintiff has not established that requesting Sergeant Walline to draft two memos led to plaintiff's termination.  First,

---

[23]The Court assumes, without deciding, that an employee can assert a retaliation claim even after an employer has recommended termination.

there is no evidence in the record that Sheriff Mink reviewed Sergeant Walline's memos.  Second, there is no indication that Sheriff Mink relied on the aforementioned memos when making his termination decision.  *See Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996) (rejecting the view that a prima facie case may be raised "merely by demonstrating some adverse action against the individual and that the employer was aware" that the employee was in a protected class); *Peterson v. Utah Dep't of Corrs.*, 301 F.3d 1182, 1188-89 (10th Cir. 2002) (noting that to establish the requisite causal connection between his protected conduct and his termination, plaintiff must show that the person who took the adverse employment action was motivated by a desire to retaliate against him because he engaged in protected activity).  Without showing a causal link between Sergeant Walline's memos and Sheriff Mink's decision to terminate his employment, plaintiff fails to raise a prima facie case of retaliation based on Captain Woodin's actions.  *BCI*, 450 F.3d at 487 (to prevail on a subordinate bias claim, a plaintiff must establish more than mere "influence" or "input" in the decisionmaking process).

Deputy Nagle also alleges that Undersheriff Fleer's failure to disclose Dr. Albert's September 11, 2008 letter to Sheriff Mink was retaliatory.  Docket No. 71 at 29.  Dr. Albert's letter states as follows:

> To whom it may concern:
>
> Scott D Nagle is a patient under my care.  He was diagnosed with type 2 diabetes mellitus on May 11, 2008.  We have put him on metformin as treatment.

Docket No. 71-9.  Even assuming that Undersheriff Fleer omitted this document from plaintiff's file, which is not clearly established, plaintiff has not sufficiently shown that the

22

absence of Dr. Albert's letter led to his termination.[24]  It is evident from Sheriff Mink's deposition that he was unwilling to rely on Deputy Nagle's own assertions about the impact of his diabetes.  Docket No. 71-13 at 6 (Mink Dep. 72:5-11).  Instead, Sheriff Mink sought a medical professional's opinion about what effect, if any, the diabetes had on plaintiff's ability to perform his job or major life activities.  *Id.*  It is undisputed that Dr. Albert's letter does not provide such evidence.  Thus, whether Dr. Albert's letter was in plaintiff's employee file is irrelevant because it would not have provided Sheriff Mink with the information he sought.  Sheriff Mink was aware that plaintiff had diabetes and it is questionable what impact, if any, a letter from Dr. Albert stating the same would have had.  *Cf. Martin v. AT&T Corp.*, 331 F. Supp. 2d 1274, 1302 (D. Colo. 2004) (a defendant cannot escape liability simply because the decisionmaker may not have had retaliatory intent, if the subordinate had such intent and supplied the decisionmaker with false or distorted information which placed plaintiff at risk).

Furthermore, Sheriff Mink did not rely solely on Undersheriff Fleer's recommendation or plaintiff's employee file; instead, he independently reviewed all available information, held a meeting wherein plaintiff could provide evidence, and exercised his own judgment.  *BCI*, 450 F.3d at 488 ("simply asking an employee for his version of the events may defeat the inference" that an employment decision was

---

[24]Plaintiff cites to Sheriff Mink's deposition wherein the Sheriff is asked "the reason you didn't consider it is because that material was not included in the – in the materials that you reviewed; is that correct?"  Docket No. 71-13 at 4 (Mink Dep. 56:1-6).  To which Sheriff Mink responds "Yes."  *Id.*  Plaintiff contends that "it" refers to plaintiff's diabetes and "material" refers to Dr. Albert's letter.  Docket No. 71 at 29.  However, even when viewing the evidence in a light most favorable to plaintiff, such vague references are insufficient to raise a genuine issue of material fact.  No reasonable jury viewing this evidence could establish the nature of Sheriff Mink's statements.

discriminatory).  None of this evidence shows that Sheriff Mink was either a pawn or a rubber stamp acting at the behest of Undersheriff Fleer.  *Cf. Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1231 (10th Cir. 2000) ("a defendant may be held liable if the manager who discharged the plaintiff merely acted as a rubber stamp, or the 'cat's paw,' for a subordinate employee's prejudice").  Nor does the evidence suggest that Sheriff Mink was unduly influenced by a subordinate's discriminatory recommendation. The evidence in the record is insufficient to show a causal connection between Deputy Nagle's termination and the absence of Dr. Albert's letter.  Plaintiff therefore fails to raise a prima facie case of subordinate bias retaliation.

Even assuming that Deputy Nagle made a sufficient showing for a prima facie case, his retaliation claim fails because the record is devoid of evidence to rebut defendants' non-discriminatory reason for his termination.  *See Selenke*, 248 F.3d at 1264.  Defendants claim they terminated plaintiff's employment because of his persistent failure to complete timely reports, a total of twelve IA investigations during his tenure with the JCSO, and an inability to improve his work performance even while on a performance plan.  Docket No. 57-44.  Additionally, Lieutenant Prange and Captain Woodin were unaware of plaintiff's diabetes at the time they made their recommendations that the JCSO terminate his employment.  Sheriff Mink also gave plaintiff an opportunity to present evidence prior to making a final determination on his employment.  Plaintiff provides no evidence rebutting the suggestion that his termination was based on anything other than a history of poor performance at work.  *Anderson*, 181 F.3d at 1179 (a plaintiff may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

24

proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.").  In this case, plaintiff's assertion that defendants' reliance on his poor performance history is pretext is unsupported. Accordingly, Deputy Nagle has failed to raise a genuine question of material fact to support a claim for retaliation under the ADA.  Defendants are entitled to summary judgment on this claim.

## IV.  CONCLUSION

Therefore, it is

**ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 57] is **GRANTED**.  It is further

**ORDERED** that plaintiff's third claim for relief based on an alleged violation of his equal protection rights is **DISMISSED**.  It is further

**ORDERED** that Defendants' Motion to Exclude Expert Testimony [Docket No. 76] is **DENIED** as moot.  It is further

**ORDERED** that the Trial Preparation Conference scheduled for August 3, 2012 and the trial set for August 20, 2012 are hereby **VACATED**.  It is further

**ORDERED** that judgment shall enter in favor of defendants Sheriff Ted Mink and against plaintiff on plaintiff's first claim for violation of the Americans with Disabilities Act and plaintiff's second claim for retaliation.

DATED August 2, 2012.

BY THE COURT:


  s/Philip A. Brimmer                         
PHILIP A. BRIMMER
United States District Judge